BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
PAULA R. BROWN (254142)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
pbrown@bholaw.com

SMN LAW GROUP APC
STEVEN M. NUNEZ (185421)
3517 Camino del Rio S., Suite 215
San Diego, CA 92108
Tel: 619/296-8400
steve@smnlaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDRA I. KAZEMIER, individually and as Trustee of the 2023 Kazemier Family Trust, on behalf of herself and a class of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO BANK, National Association; WELLS FARGO & COMPANY, a Delaware Corporation, <br><br> Defendants. | Case No. **'25CV0727 BJC DDL** <br><br> **CLASS ACTION** <br><br> **CLASS ACTION COMPLAINT** <br><br><br><br> **DEMAND FOR JURY TRIAL** |

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

Alexandra I. Kazemier, individually and as Trustee of the 2023 Kazemier Family Trust, brings this action against Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company (together, "Defendants" or "Wells Fargo"), on behalf of herself and a class of all similarly situated people. Based on personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters, Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      Over the past decade, as technology has rapidly developed, Americans have increasingly adopted the use of online and mobile banking to manage their money.[1] Once requiring an in-person visit to a bank, consumers can now review account information, deposit checks, make electronic payments, and conduct wire transfers, among other things, directly from their computers, smartphones, or other mobile devices without any direct contact with banking personnel.

2.      Unfortunately, as online and mobile banking have become ubiquitous, so too have the increasingly sophisticated scams designed to steal consumers' money. Scammers can gain access to consumers' online banking accounts through mobile device hacks, such as SIM swaps and various other data breaches, as well as impersonation communications known as phishing. After gaining access to an account, scammers can then transfer money electronically through bank transfer, bill payment, payment apps such as Venmo and Zelle, and wire transfer to accounts controlled by the scammers. Banks, like Wells Fargo, are well aware of these scams

---

[1]      American Bankers Association, "National Survey: Record Number of Bank Customers Use Mobile Apps More Than Any Other Channel to Manage Their Accounts," November 22, 2024. https://www.aba.com/about-us/press-room/press-releases/consumer-survey-banking-methods2024#:~:text=The%20national%20survey%20found%20that,in%20the%20past%2012%20months.

1

00224288

and so encourage consumers to use online and mobile banking by highlighting the convenience and promising robust security protections to prevent fraud.

3.      Consumers are also protected by the law. The Electronic Fund Transfer Act ("EFTA"), which is a remedial consumer protection statute, limits a consumer's liability in the event of an unauthorized electronic fund transfer ("EFT"). An unauthorized EFT is a fund transfer made by an electronic terminal, telephone, computer, or magnetic tape, from a consumer's account initiated by a person that does not have authority to initiate the transfer. An unauthorized EFT includes an unauthorized Payment Order used to initiate a wire transfer and purportedly authorize the bank to withdraw money from the consumer's account.

4.      Under the EFTA, if a consumer reports an unauthorized EFT to the bank within two days, the consumer's liability is limited to $50. If the consumer reports the fraud within 60 days, the consumer's liability is generally limited to $500. The EFTA also requires banks to affirmatively investigate a transfer if a consumer claims the transfer was unauthorized. It is the bank's burden to prove that the transaction was authorized if the bank wants to avoid the consumer liability limits imposed by the EFTA.

5.      Wells Fargo is aware that its customers are losing millions through fraudulent wire transfers conducted through sophisticated scams. However, as a matter of policy, Wells Fargo fails to comply with the EFTA for unauthorized wire transfer Payment Orders. Wells Fargo illegally shifts all burden to the consumer who is the victim of fraud by requiring the victim to prove the Payment Order was not authorized. Wells Fargo also does not conduct a reasonable investigation into unauthorized wire transfer Payment Order. So long as Wells Fargo determines that the wire transfer request was made from the consumer's account using the consumer's credentials, Wells Fargo deems the transfer authorized. Wells Fargo's "investigation" is wholly insufficient and inconsistent with the EFTA and violates the Uniform Commercial Code.

BLOOD HURST & O' REARDON, LLP

00224288

6.      Plaintiff brings this action against Wells Fargo on behalf of herself and all other similarly situated consumers for Wells Fargo's violation of the EFTA, the Uniform Commercial Code Article 4A, and California's Unfair Competition Law Cal. Bus. & Prof. Code § 17200, *et seq.* Plaintiff seeks damages, restitution, and injunctive relief.

## **PARTIES**

7.      Plaintiff Alexandra I. Kazemier resides in San Diego, California. Plaintiff is also Trustee and Grantor of the 2023 Kazemier Family Trust. Plaintiff has had checking and savings accounts with Wells Fargo since 2014. On June 21, 2024, Wells Fargo contacted Plaintiff by telephone to confirm two online wire transfer requests for $25,000 each, from her savings account, which is in her name as trustee of the 2023 Kazemier Family Trust. Plaintiff informed the Wells Fargo representative that she did not initiate those nor any wire transfer requests and any such requests showing in the system were unauthorized and fraudulent. Later, the same day, scammers impersonating Wells Fargo called Plaintiff purporting to confirm two online wire transfer requests for $25,000. In light of Plaintiff's earlier conversation with Wells Fargo, the scammers duped Plaintiff into confirming her identity by providing a texted code. Despite being told personally by Plaintiff that the online wire transfers initiated from her savings account were unauthorized and fraudulent, Wells Fargo processed the wire transfers on June 21, 2024 and June 24, 2024, as well as an additional online wire transfer request on June 25, 2024. All three transfers went to the same account controlled by the fraudsters, for a total of $73,877.23 in fraudulent wire transfers. Plaintiff did not authorize any of the wire transfers.

8.      On June 27, 2024, after learning that Wells Fargo processed the wire transfer requests, Plaintiff reported by telephone the fraudulent wire transfers to the Wells Fargo fraud department. On July 6, 2024, Plaintiff personally delivered a written demand to Wells Fargo to return the money fraudulently transferred from her account. She later faxed the letter to Wells Fargo on July 8, 2024.

CLASS ACTION COMPLAINT

9.      On July 9, 2024, Wells Fargo informed Plaintiff by letter that it would not return her money. Wells Fargo informed Plaintiff that "after reviewing all the information available to [it] regarding the online wire transactions [she was] disputing, [it had] determined that those transactions were performed by [her], or someone using [her] username and password." Despite being told on numerous occasions before, during and after the transactions, that the transactions were fraudulent Wells Fargo stated that its Online Wire Terms and Conditions, Online Access Agreement and Deposit Account Agreement made customers, like Plaintiff, entirely "responsible for online wires that originate using [her] username and password." To date, Wells Fargo has refused to conduct a reasonable investigation or return the money Plaintiff lost due to the fraudulent wire transfers.

10.      Defendant Wells Fargo Bank, N.A., is a federally chartered bank with its principal place of business in South Dakota. Wells Fargo Bank, N.A. is 100% owned by Defendant Wells Fargo & Company.

11.      Defendant Wells Fargo & Company is a Delaware Corporation and a bank holding company registered under the Bank Holding Company Act of 1956, with its principal place of business in San Francisco, California. Wells Fargo & Company is the parent company to Wells Fargo Bank, N.A. Hereinafter Wells Fargo Bank, N.A. and Wells Fargo & Company are collectively referred to as Wells Fargo. Wells Fargo is a venerated American financial institution that was founded during the precipice of a technological revolution in 1852. (https://www.wellsfargo.com/about/corporate/history/) Wells Fargo, by its own accord, "is a leading financial services company that has approximately $1.9 trillion in assets." (2023 Annual Report, Ex. 13 Financial Review, p. 4)

12.      On information and belief, Plaintiffs allege that at all relevant times, Defendants and each of them were and are inadequately capitalized and have no genuine or separate existence, but were and are used and are existing for the sole

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

purpose of permitting the other Defendants to transact a portion of their business under a separate guise.

13.    At all relevant times, Defendants and each of them completely controlled, dominated, managed, and operated the other Defendants and intermingled their assets with the assets owned by the other Defendants to suit their convenience, such that the individuality or separateness of the Defendants did not exist. The acts of Defendants and each of them were and are the acts of the other Defendants. Failure to pierce the corporate veil would promote injustice and, based thereon, Defendants and each of them are jointly and severally liable with the other Defendants.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the action arises under the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq*., and its implementing Regulation E. Jurisdiction also arises under 28 U.S.C. § 1367 for pendent state law claims. The Court also has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because there is minimal diversity and the amount in controversy exceeds $5,000,000.

15.    Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district.

## FACTUAL ALLEGATIONS

### I.    *The Evolution of Online Banking and the Rise of Corresponding Fraud*

16.    In 1978, consumer access to wire transfer networks was extremely limited—and continued to be for decades. A 2002 Congressional Research Service report on electronic payment systems in the United States, for example, did not even acknowledge the possibility of consumer use of the wire networks, defining the "primary wire transfer system" as a network that "transfers, disburses, and collects funds for depository financial institutions, corporations, and governmental agencies." In its tri-annual studies of non-cash payment activity and trends in the United States,

BLOOD HURST & O' REARDON, LLP

the Federal Reserve, as late as 2010, defined consumer or retail payments—as opposed to business or financial institution payments—to exclude wire transfers entirely.

17.    The past decade, however, has seen a rapid expansion of widely available internet access, high-speed Wi-Fi, and mobile devices. With this changing environment came the rise of online and mobile banking, through which consumers have become accustomed to accessing their bank accounts electronically, reviewing account balances online, going paperless, paying bills automatically, and engaging in a wide array of online and mobile banking activity, including remote wire transfers.

18.    With these shifts, banks, including Wells Fargo, began to market and provide electronic payment options directly to consumers, including the ability to seamlessly transfer money between bank accounts online or using mobile devices. Many banks also redesigned their payment systems to provide consumers with electronic access to wire transfer services over the internet or on mobile devices.

19.    Wells Fargo encourages consumers to use online wire transfers by highlighting the convenience and speed: "[U]se wire transfers to get funds to family, business, or internationally, where timing matters." (Wells Fargo Digital Wires, www.wellsfargo.com/online-banking/wires/)

20.    The explosion of online and mobile banking, including the ability to electronically access wire transfer services, has been accompanied by an explosion in frauds through which scammers attempt to infiltrate online or mobile banking to steal consumers' money.

21.    One commonly used scam is an impersonation scam, also referred to as "phishing," through which scammers call or send emails or text messages to consumers pretending to be a bank or other reputable institution, such as the government or a well-known business. These sophisticated scammers are able to dupe the telephone number of an institution so it appears on a caller-id as if that institution is in fact calling the consumer. The purpose of impersonation scams is to trick

00224288

BLOOD HURST & O' REARDON, LLP

consumers into providing personal or security information that can be used to fraudulently infiltrate consumer accounts, including online or mobile banking.

22.    Another commonly used scam targets mobile device subscriber identity modules, or SIMs, that contain unique identifiers for consumers' mobile phones. These "SIM swaps" are done by obtaining personal identifying information via text message or the dark web, after which scammers contact mobile providers to activate new phones with consumers' stolen SIMs and deactivate consumers' actual phones. Once in control, scammers can reset key apps on devices using text message authentication, including mobile banking and email apps.

23.    The goal of these and other similarly sophisticated scams aimed at modern consumers is the same: gaining information sufficient to fraudulently infiltrate online and mobile banking. Scammers then are able to steal consumers' money through various means made available by consumers' banks, including online purchases using virtual debit cards, peer-to-peer payments such as Zelle or Venmo, purchases of gift cards or cryptocurrency, and wire transfers where banks have provided direct electronic access to the wire transfer networks.

24.    The FTC reported that in 2022 alone, scammers stole hundreds of millions of dollars from consumers using text messages impersonating banks, delivery services, Amazon, and other common service providers. That same report indicated that the single most frequent party that scammers impersonated over text was consumers' banks.

**II.    *The Electronic Fund Transfer Act: Landmark Consumer Protection Legislation Governing Electronic Payments***

25.    Congress enacted the Electronic Fund Transfer Act ("EFTA") in 1978, decades before banks provided direct electronic access to wire transfer networks via online or mobile banking, to clarify the rights and liabilities of consumers, banks, and other intermediaries for electronic transfers of money. The EFTA and its

implementing Regulation E ("Reg. E") are landmark protections that shift liability for unauthorized transfers from consumers to banks.

26.    The EFTA governs any "electronic fund transfer" or "EFT," which it defines as any transfer of funds that is initiated through an electronic terminal, telephonic instrument, or computer that orders, instructs, or authorizes a financial institution, such as Wells Fargo, to debit or credit an account. 15 U.S.C. § 1693a(7). Everyday examples of EFTs include purchases made using debit cards, ATM withdrawals, direct deposits, online bill payments, peer-to-peer payments using mobile apps, transfers among consumers' accounts, and all other debits or credits initiated by computer or mobile device. *Id.*; 12 C.F.R § 1005.3(b)(1).

27.    The EFTA and Reg. E protect consumers from unauthorized EFTs and other errors. EFTs are unauthorized when they do not benefit consumers and are made by persons who are not the consumers or other authorized users. 15 U.S.C. § 1693a(12).

28.    EFTs made with the consumer's credentials that were obtained by fraud are unauthorized. 12 C.F.R. § 205, Supp. I at 2(m); 12 C.F.R. § 1005, Supp. I at 2(m). That means, if a consumer is duped into providing their account credentials to a scammer, any EFT made by the scammer is unauthorized.

29.    The EFTA's consumer protections for unauthorized EFTs adhere to a three-tiered structure that is based on when a consumer provides notice to the bank of the unauthorized EFT. If a consumer notifies the bank of an unauthorized EFT within two business days of discovering the EFT, the consumer's losses are capped at $50 or less, and the bank must reimburse anything above $50. 15 U.S.C. § 1693g(a).

30.    If a consumer notifies the bank of an unauthorized EFT within sixty days of discovering the EFT, the consumer's losses are capped at $500, but only if the bank proves that those losses would not have occurred had the consumer reported the unauthorized EFT within two business days rather than sixty. 15 U.S.C. § 1693g(a).

31.    If a consumer does not notify the bank of an unauthorized EFT within 60 days of discovery of the EFT, their losses are not capped, but only if the bank proves that the losses would not have occurred had the consumer reported the unauthorized EFT within sixty days rather than later. 15 U.S.C. § 1693g(a).

32.    Additionally, if a consumer notifies a bank of an unauthorized EFT, the bank must conduct a reasonable investigation of the EFT and determine whether it was conducted in error. 15 U.S.C. § 1693f. "[T]he burden of proof is upon the financial institution to show that the electronic fund transfer was authorized." 15 U.S.C. § 1693g(b). That means, the liability limits under the EFTA apply unless the bank can prove that the EFT was authorized.

33.    The EFTA and Reg. E also require banks to disclose the terms and conditions that apply to EFTs in readily understandable language. 15 U.S.C. § 1693c(a); 12 C.F.R. § 1005.4.

34.    Consumer protections in the EFTA and Reg. E, including for unauthorized EFTs, cannot be waived or limited by any agreement, including consumers' deposit agreements, online account agreements, or fund transfer agreements with their banks. 15 U.S.C. § 1693l.

35.    The practical result of the EFTA and Reg. E is that banks bear the bulk of losses when consumers' funds are lost due to scammers' large-dollar, unauthorized EFTs. Banks thus, are incentivized to prevent unauthorized access to consumers' bank accounts through online or mobile channels, thereby fostering consumer confidence in the electronic banking system.

**III.    *Unauthorized Wire Transfer Payment Orders Are Unauthorized EFTs***

36.    Wire transfers are electronic means of moving money between banks over a secure network. The first wire network was developed by the Federal Reserve as a faster and more secure way to settle amounts owed between banks located in different geographic areas, replacing the need for banks to settle accounts through physical delivery of cash or gold.

9

CLASS ACTION COMPLAINT

37.     Over time, the wire networks grew commercially as alternatives for businesses to sending paper instruments such as checks or transporting cash or gold to settle accounts. These transactions were historically initiated in person, over the phone, or by other means agreed upon between the businesses that accessed the wire transfer networks and their banks.

38.     The simplest and most common form of a wire transfer involves four parties: the sender, who wants to send money; the beneficiary, to whom the sender wants to send money; the receiving bank, a bank that receives an instruction to execute a wire transfer (and where the sender often has a bank account); and the beneficiary bank, a bank at which the beneficiary has a bank account. The actual movement of money from the sender to the beneficiary involves several fund transfers, only some of which actually involve the wire transfer networks.

39.     The first step is known as a "Payment Order," which is an instruction sent by the person initiating the wire transfer to the bank instructing it to pay or cause another bank to pay the beneficiary. U.C.C. § 4A-103(a)(1).

40.     When a receiving bank accepts a sender's Payment Order, it sends a new Payment Order, either directly to the beneficiary bank if both banks participate in a common wire network, or through one or more intermediary banks, in which case each bank accepts the prior Payment Order and issues a new Payment Order until the final Payment Order is accepted by the beneficiary bank. The simplest form – transmission of a Payment Order directly from the receiving bank to the beneficiary bank over a wire network – is referred to herein as a "Bank-to-Bank Wire."

41.     When a beneficiary bank accepts the final Payment Order, it becomes obligated to pay the amount in question to the beneficiary. U.C.C. § 4A-404(a).

42.     For example, if Dora, who has a bank account at Wells Fargo, wants to send $1,000,000 by wire to Diego, who has a bank account at Bank A, Dora will send a Payment Order to Wells Fargo instructing Wells Fargo to cause Bank A to pay

BLOOD HURST & O' REARDON, LLP

10

$1,000,000 into Diego's bank account. Dora is the sender, Wells Fargo is the receiving bank, Diego is the beneficiary, and Bank A is the beneficiary bank.

43.    Bank-to-Bank Wires are fast and efficient because the participating banks agree to a predetermined set of rules and processes for settlement, netting out obligations across millions of dollars of transfers every day. As a result of these agreements among the banks, when a beneficiary bank receives a Payment Order from a receiving bank over a wire network, the beneficiary bank need not analyze the receiving bank's creditworthiness or assess the likelihood that the receiving bank will pay. The beneficiary bank can simply accept the Payment Order. Today, acceptance of interbank Payment Orders is near instantaneous.

44.    For example, banks that participate in Fedwire, one of the two primary domestic wire networks, have master accounts with the Federal Reserve. When a receiving bank sends a Payment Order through Fedwire, a Federal Reserve bank will debit the receiving bank's master account and credit the beneficiary bank's master account. Similarly, for banks that participate in the Clearing House Interbank Payments System, or CHIPS, settlement occurs at the end of the day, when CHIPS nets all incoming and outgoing Bank-to-Bank Wires for each bank.  Those banks whose outgoing payments exceeded their incoming receipts then immediately send, via Fedwire, funds to cover the shortfall to a CHIPS settlement account. CHIPS then sends those funds to the banks whose incoming receipts exceeded their outgoing payments.

45.    A Bank-to-Bank Wire is a movement of money between banks. While initiated by a sender's Payment Order to the receiving bank and resulting in the beneficiary bank's payment obligation to the beneficiary, money in a Bank-to-Bank Wire moves only from a receiving bank to a beneficiary bank (at times through intermediary banks).

46.    In the example above, the Bank-to-Bank Wire is solely between Wells Fargo and Bank A. Internal Wells Fargo records of these Bank-to-Bank Wires identify

BLOOD HURST & O' REARDON, LLP

Wells Fargo's own accounts (not consumers' accounts) as the sources of the funds and the beneficiary bank's own accounts as the recipients. Wells Fargo then reimburses itself through a debit of the consumer's account, which is per the Payment Order.

47.    In connection with a Bank-to-Bank Wire, the sender is obligated to pay for the initial Payment Order, U.C.C. § 4A-402(b), while the beneficiary bank, upon accepting the final Payment Order is obligated to pay the beneficiary, *id*. § 4A-404(a). In the example, Dora is obligated to pay $1,000,000 to Wells Fargo for accepting her initial Payment Order and Bank A is obligated to pay $1,000,000 to Diego when it accepts Wells Fargo's Payment Order. But the payments made to satisfy these obligations are independent of the Bank-to-Bank Wire.

48.    The process by which fraudsters make unauthorized wire transfer Payment Orders on Wells Fargo's online system is simple and fast. After gaining unauthorized access to an account, a scammer creates a new payee (or beneficiary) to receive the transfer. To do so, the scammer enters information (without authorization) into Wells Fargo's online or mobile banking platform about the payee, including the name and account information.

49.    Next, the scammer sends an electronic Payment Order from the consumer's account instructing Wells Fargo to execute a Bank-to-Bank Wire and to electronically authorize Wells Fargo—without consumers' knowledge or consent—to debit the consumer's account.

50.    Consistent with the Online Access Agreement, Wells Fargo performs minimal security procedures to confirm authorization of the transfer: "The Security Procedure consists of verifying your username and a password, and/or such other additional security and authentication methods as we may require from time to time. We may also require you to answer security questions, use random number

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00224288

generators, or one-time passcodes to further verify an Order initiated on the Website from your Wires Funding Eligible Account."[2]

51.    Once Wells Fargo accepts the scammer's fraudulent Payment Order, Wells Fargo sends a new Payment Order over the wire networks to a beneficiary bank. Money will then be moved between Wells Fargo and the beneficiary bank in the manner predetermined by the wire network.

52.    Wells Fargo treats the scammer's fraudulent Payment Order as electronic authorization to debit the consumer's account to repay itself for the Payment Order, plus fees. Under the EFTA, the Payment Order is an unauthorized EFT.

## IV. *Wells Fargo Fails to Implement Reasonable Security Procedures to Prevent Fraudulent Wire Transfers*

53.    The amount of time between when scammers first fraudulently infiltrate online or mobile accounts and when funds are stolen can be mere minutes. As a result, it is critical for the bank to implement security procedures to ensure wire transfers are authorized. Wells Fargo fails to implement even basic security procedures.

54.    Wells Fargo regularly fails to account for obvious red flags, employs inconsistent approaches to verification, does not react quickly to real-time notices of fraudulent activity, and needlessly delays efforts to recover stolen funds.

55.    For example, scammers frequently change the account password after infiltrating a consumer's online or mobile banking. This locks the consumer out and ensures that if they notice fraudulent activity in real time they cannot stop it. Yet when Wells Fargo receives Payment Orders tied to accounts whose passwords were altered hours or even minutes earlier, Wells Fargo does not apply its most robust verification procedures to safeguard against potentially fraudulent Payment Orders. Nor does Wells Fargo respond by treating the transaction as an indication of possible identity theft.

---

[2]    https://www.wellsfargo.com/online-banking/online-access-agreement/

BLOOD HURST & O' REARDON, LLP

56.    Wells Fargo similarly does not employ its most robust security procedures in the face of other indicators of fraudulent activity, such as Payment Orders involving accounts whose status were recently upgraded, accounts that were recently enrolled in online wire transfer services, or accounts where the username or contact information was recently altered. The presence of these anomalous activities does not automatically trigger the most robust verification procedures that Wells Fargo employs or cause Wells Fargo to review the accounts for possible identity theft.

57.    Wells Fargo likewise fails to account for intra-bank transfer activity when evaluating new Payment Orders. When scammers use intra-bank transfers to empty accounts and consolidate funds into a single bank account that is then used to send to Wells Fargo a large fraudulent Payment Order, Wells Fargo's internal procedures do not flag this account activity as suspicious in any way.

58.    Wells Fargo also does not apply its most robust verification procedures to Payment Orders received within minutes of rejected Payment Orders involving the same accounts. At times Wells Fargo properly cancels fraudulent Payment Orders after it is unable to verify those orders directly—either because Wells Fargo contacts consumers who inform it that the Payment Orders are fraudulent or because scammers provide inaccurate information when contacted.

59.    Yet when scammers submit new Payment Orders minutes later using the same accounts for the same amounts, after having first been rejected, no heightened scrutiny is applied. To the contrary, at times Wells Fargo employs weaker verification procedures to the subsequent fraudulent Payment Orders.

60.    Nor do Wells Fargo's security procedures meaningfully account for consumer or account characteristics. Consumers could be Wells Fargo account holders for decades, having never sent a Payment Order over years and years of account activity, and yet first-time Payment Orders purporting to be from such consumers do not trigger Wells Fargo's most robust verification procedures, nor do such red flags prompt Wells Fargo to evaluate whether the account has been subject

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00224288

to identity theft. This is true even when Payment Orders are received hours or minutes after other red flags, such as changes to passwords, preceding intra-bank account transfers, or upgraded account statuses.

61.    Wells Fargo also does not subject Payment Orders that are anomalous based on consumers' historical account activity, such as Payment Orders for substantial amounts or that will result in near-zero account balances, to its most robust verification procedures as a matter of course.

62.    Given the lightning-fast speed at which wire networks operate, scammers' executions of these frauds are nearly instantaneous: tens of thousands of dollars disappear from consumers' bank accounts and in an instant reappear in accounts at beneficiary banks for scammers to steal. And as detailed below, Wells Fargo characterizes this complex set of transfers as a single, instantaneous "wire transfer" to confuse, mislead, and deprive affected consumers of their legal rights.

## V.    *Wells Fargo's Business Practices Violate the EFTA*

### A.    *Wells Fargo Attempts to Contractually Exempt Wire Transfer Payment Orders from the EFTA's Protections*

63.    In light of the well-known sophisticated scams targeting consumers, Wells Fargo encourages its customers to adopt online banking by touting its security procedures on its website.[3] Wells Fargo states:

- "WELLS FARGO is consistently enhancing our security measures and identifying new and emerging threats to help keep your accounts and information secure."
- "We help keep your money safe by monitoring your accounts and may contact you if we detect unusual activity. If it's not your purchase, we will help you resolve it."
- "If we notice banking behavior that differs from your usual activity, we may take the following steps to help protect your accounts: send you an access code to confirm your identity before you complete actions online [;] Prevent or delay online payments [;] Decline card

---

[3]    https://www.wellsfargo.com/privacy-security/fraud/protecting-you/

BLOOD HURST & O' REARDON, LLP

transactions [;] Restrict access to online banking, which may require proof of identity before it is restored."

64.     Wells Fargo even touts the EFTA's protections: "Unauthorized Account Activity [¶] Under federal law Regulation E (Electronic Fund Transfer Act) provides certain protections to consumer customers when there is unauthorized account activity.  Regulation E covers transfers of funds through electronic methods such as, the use of a debit or credit card, ATM withdrawals, and direct deposit activity through a checking, savings or other consumer asset account at a financial institution used primarily for person, family, or household purposes."

65.     However, when consumers wish to engage in online banking with Wells Fargo, they must agree to Wells Fargo's standard-form Online Access Agreement,[4] which misleadingly states that the EFTA is not applicable to consumer wire transfer Payment Orders.

66.     Section 5 of the Online Access Agreement is entitled "Electronic Fund Transfers Provisions (Consumer Accounts Only)." It states in relevant part: "The provisions in this Section apply only to electronic fund transfers (EFTs) that debit or credit a Consumer's checking, savings, or other asset account and are subject to Regulation E (subpart A), which implements the federal Electronic Fund Transfer Act."

67.     Wells Fargo specifically exempts wire transfer Payment Orders from these protections: "Note: Among other things, this Section does not apply to wire transfers or remittance transfers (e.g. ExpressSend® and consumer-initiated international wire transfers). For additional information about wire transfers or remittance transfers, please refer to Section 8 of this Agreement."

68.     Instead, Wells Fargo states that wire transfer Payment Orders are subject to the Uniform Commercial Code (UCC), not the EFTA.

---

[4]     https://www.wellsfargo.com/online-banking/online-access-agreement/

CLASS ACTION COMPLAINT

69.    Section 8 of the Online Access Agreement is entitled "Digital Wires (formerly known as Online Wires)." Section 8(a) states: "When you use Wire Transfers, you can instruct us to transfer funds by wire from your Eligible Account that you use to fund an online wire transfer ('Wires Funding Eligible Account'), with such instruction being an 'Order'."

70.    Section 8(b), entitled "Security Procedure" then states in relevant part:

**"You agree to be bound by any Order that WELLS FARGO receives and verifies following the Security Procedure, even if the Order was not authorized by you.** You agree that we may be liable only for damages required to be paid under Uniform Commercial Code Article 4A. In no event will we be liable for any exemplary, special, indirect, or consequential loss, damage, costs, or expense of any nature, including lost profits, even if we have been informed of the possibility of such damages, except as may be required by law or regulation. This Section 8(b) will control as the Security Procedure with respect to Orders for Wire Transfers instead of Section 17(c) below."

71.    Wells Fargo's attempt to contractually declare wire transfer Payment Orders as not subject to the EFTA and Reg. E in favor of the UCC is not consistent with the UCC's legal framework.

72.    Article 4A of the UCC was adopted after the EFTA and was crafted to not interfere with the EFTA. In particular, Article 4A expressly provides that it does not apply to funds transfers that are governed by the EFTA, U.C.C. § 4A-108(a), and that in the event of any inconsistency between the UCC and the EFTA, the EFTA governs, *id*. § 4A-108(c).

73.    U.C.C § 4A-108 states that except for certain remittance transfers, "this Article does not apply to a funds transfer *any part of which* is governed by the Electronic Fund Transfer Act of 1978 (Title XX, Public Law 95-630, 92 Stat. 3728, 15 U.S.C. § 1693, *et seq*.) as amended from time to time.

74.    Additionally, the EFTA's consumer protections for unauthorized EFTs cannot be waived or limited by any agreement, including through Wells Fargo's

CLASS ACTION COMPLAINT

00224288

BLOOD HURST & O' REARDON, LLP

deposit agreements, online account agreements, or fund transfer agreements. 15 U.S.C. § 1693l.

**B.** ***Wells Fargo Fails to Comply with the EFTA for Unauthorized Wire Transfer Payment Orders***

75.    When consumers notify Wells Fargo that their online or mobile banking has been compromised through an unauthorized wire transfer, Wells Fargo routinely takes no responsibility for the matter.

76.    Instead, Wells Fargo simply checks to see if the Payment Order was made from the consumer's account with their credentials. If the consumer's credentials were used, then Wells Fargo deems the transfer authorized.

77.    Wells Fargo details this process in its "Resolution of online wire inquiry" through form letters which state:

> After reviewing all the information available to us regarding the online wire transactions you are disputing, we have determined that those transactions were performed by you, or someone using your username and password. Under our Online Wire Terms and Conditions, Online Access Agreement and Deposit Account Agreement, you are responsible for online wires that originate using your username and password. As a courtesy, we initiated one or more wire recalls on your behalf to attempt recovery of the funds from the bank that received these wire transfers. Unfortunately, the beneficiary bank responded that there were no funds available to return. As a result, we are unable to reimburse you and have closed your claim.

78.    Wells Fargo's form letters actively mislead Plaintiff and other Class members regarding Wells Fargo's obligations under the EFTA and the limits on consumer liability.

79.    Wells Fargo's form letters do not describe the scope of the investigation, what evidence Wells Fargo relied upon, or provide a description of when or how the consumer entered into the Online Wire Terms and Conditions. The form letters do not append any of the agreements its references.

B<small>LOOD</small> H<small>URST</small> & O' R<small>EARDON</small>, LLP

00224288

80.     Other than blaming consumers, Wells Fargo's form letters provide no detail regarding the security procedures it employed, other than the username and password, nor do they provide any evidence that any additional procedures were followed.

81.     Regulation E and regulations drafted by the Consumer Financial Protection Bureau (CFPB) in implementing the EFTA both state that "[a]n unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery." 12 C.F.R. § 205, Supp. I at 2(m); 12 C.F.R. § 1005, Supp. I at 2(m). An "access device" refers to "a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers." 12 C.F.R. § 205.2(a)(1).

82.     Accordingly, Wells Fargo's determination that wire transfer Payment Orders are authorized simply because the consumer's username and password were used is not a reasonable investigation under the EFTA. Nor is use of the consumer's username and password sufficient proof under the EFTA that the Payment Order was authorized.

83.     Because Wells Fargo does not conduct a reasonable investigation beyond the username and password, its failure to reimburse Plaintiff and other Class Members for unauthorized wire transfer Payment Orders violates the requirements of the EFTA.

## VI.   *Wells Fargo's Business Practices Violate the UCC*

84.     Even if the UCC applies, Wells Fargo does not meet its requirements. The UCC generally provides that banks must reimburse customers for unauthorized Payment Orders. U.C.C. § 4A-204(a). However, banks and their customers can agree upon specific security procedures for verifying Payment Orders that the banks receive. *Id.* § 4A-201. If banks can prove that these procedures are commercially reasonable, were followed, and that Payment Orders were accepted in good faith, the UCC provides that the banks need not reimburse customers, even for unauthorized Payment Orders. *Id.* § 4A-202.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

85.    Whether particular security procedures are commercially reasonable is determined by a variety of factors, including the circumstances of the customer known to the bank, such as the size, type, and frequency of Payment Orders normally issued by the customer to the bank.

86.    The UCC specifies that use of an authorized signature specimen alone is not a sufficient security procedure. Consistent with this approach, legal and policy consensus is that comparable single-factor procedures, such as an online username and password, as used by Wells Fargo, are not a commercially reasonable security procedure standing alone.

87.    For example, the Federal Financial Institutions Examination Council ("FFIEC"), a federal interagency body that prescribes uniform procedures for U.S. financial institutions, has publicly cautioned that use of single-factor authentication is inadequate either to safeguard against scammers fraudulently infiltrating customers' online or mobile banking or to prevent widespread payment fraud.[5]

88.    Multi-Factor Authentication ("MFA"), as opposed to single-factor authentication, is one available control for financial institutions to prevent fraudulent online or mobile activity. MFA requires more than one distinct authentication factor. The factors are something consumers know (such as usernames and passwords), something consumers have (such as mobile devices), and something consumers are (such as fingerprints or other biometric identifiers).

89.    MFA, however, has been shown to be ineffective when used alone. Consumers' email accounts, browsers, and mobile devices are common access points for scammers. Thus, the FFIEC recommends that financial institutions employ layered security approaches, which incorporates multiple preventative, detective, and corrective controls, and which is designed to compensate for potential weaknesses in

---

[5]    https://www.ffiec.gov/press/pdf/Authentication-and-Access-to-Financial-Institution-Services-and-Systems.pdf

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00224288

any one control, including MFA. Wells Fargo does not implement these security practices for wire transfer Payment Orders.

90.    A critical aspect of layered security is an evaluation of consumers and their account histories, including usage patterns, the frequency of high-dollar transactions, and whether transactions or other recent online behaviors are anomalous. Nacha, the entity formerly known as the National Automated Clearinghouse Association, which manages the ACH payment network, has commented that commercially reasonable, risk-based approaches to security will consider account characteristics and anomalous behavior.[6] When banks identify anomalous behavior or transactions, commercially reasonable and effective controls will prompt the banks to employ more robust procedures to scrutinize and verify electronic payment activity. Wells Fargo does not implement use of anomalous behavior for wire transfer Payment Orders.

91.    In addition to MFA, layered security can include a number of other effective controls, such as requiring dual authorization through different access devices, such as a phone call to a landline and a text message to a mobile device, limits on transaction frequency or size based on prior usage patterns, and the use of enhanced authentication techniques after changes to account types or characteristics, such as account upgrades or changes to passwords.

92.    Another aspect of effective layered security is sufficient training and controls for call center and fraud prevention employees. Scammers use engineering and other sophisticated techniques to deceive these employees into resetting passwords or granting scammers access to accounts, including online or mobile banking. Commercially reasonable security procedures are those that employ monitoring and processes to defeat fraudulent transactions in real time.

---

[6]    http://nacha.org/system/files/202211/The_Basics_of_Authentication_in_the_ACH_Network_2022_Update.pdf

CLASS ACTION COMPLAINT

93.    Wells Fargo's reliance on only the consumer's username and password is not commercially reasonable security procedures. As it a result, Wells Fargo under the UCC, Wells Fargo must reimburse Plaintiff and the other Class members for the unauthorized wire transfer payment orders.

## CLASS ALLEGATIONS

94.    Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and as a representative of a class who are similarly situated and who fall within the following class definitions:

> All Wells Fargo customers within the United States who notified Wells Fargo of an unauthorized wire transfer payment order from their consumer account within sixty days of the transfer, and were not fully reimbursed by Wells Fargo.

95.    Excluded from the Class are governmental entities, any judge, justice or judicial officer presiding over this matter and the members of his or her immediate family, and the Defendants, along with their respective parents, subsidiaries and/or affiliates. Also excluded from this class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity.

96.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule23(a)(1)-(4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

97.    Numerosity. Plaintiffs do not know the exact size of the class. However, Plaintiffs believe that the number is so numerous that joinder is impracticable.

98.    Typicality. The claims of Plaintiff are typical of the claims of the Class because all Class members were injured through the uniform prohibited conduct described above.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

00224288

99.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately protect the interest of the class.  Plaintiff does not have claims that are unique to Plaintiff and not the other Class members, nor are there defenses unique to Plaintiff that could undermine the efficient resolution of the claims of the class. Plaintiff has no conflicts with any other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and is represented by competent counsel, experienced in class action litigation. The Plaintiff's interests are coincident with, and not antagonistic to, those of the class.

100.    <u>Commonality and Predominance</u>. Numerous questions of law and fact are common to the Class and predominate over individual issues, including, but not limited to the following:

(a)    Whether wire transfer Payment Orders initiated through online banking are governed by the EFTA;

(b)    Whether the Wells Fargo Online Access Agreement illegally attempts to alter the rights afforded by the EFTA;

(c)    Whether the Wells Fargo conducted a reasonable investigation under the EFTA

(d)    Whether Wells Fargo's refusal to refund funds debited from consumers' accounts resulting from unauthorized online wire transfer requests and reported within 60 days violates the EFTA;

(e)    Whether the Wells Fargo's Online Access Agreement security procedure as stated is commercially reasonable under the UCC;

(f)    Whether Wells Fargo's refusal to refund unauthorized online wire transfer requests violates the UCC Article 4A.

(g)    Whether Wells Fargo's business practices are unlawful and unfair under the UCL.

(h)    Whether Plaintiff and other members of the Class have been injured and the proper measure of their losses.

Blood Hurst & O' Reardon, LLP

00224288

101.   <u>Superiority</u>.  Class action treatment is superior to the alternatives for the fair and efficient adjudication of this controversy. Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties. Among other things, there is no interest by Class members in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of law.

102.   All members of the proposed Class are readily ascertainable. Defendant maintains records that allow it to identify its customers who reported an unauthorized wire transfer Payment Order within 60 days and were not fully reimbursed.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq*.**

**(On behalf of Plaintiff and the Nationwide Class)**

103.   Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 102 as if fully set forth by this reference.

104.   Wells Fargo is a financial institution within the meaning of the Electronic Funds Transfer Act ("EFTA"). 12 C.F.R. § 1005.11.

105.   Class members' accounts at Wells Fargo, including Plaintiff's account, were and are demand deposit, savings deposit, or other asset accounts established primarily for personal, family, and household purposes.

106.   Wells Fargo holds or held Class members' accounts, including Plaintiff's accounts, and has issued online access and mobile banking with an explicit agreement to perform electronic funds transfers. As a result, Plaintiff and Class members are covered "persons" under EFTA. 12 C.F.R. § 1005.2

107.   An EFT under the EFTA is any transfer that "is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00224288

order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7); 12 C.F.R. § 1005.3(b)(1).

108.   An EFT is unauthorized when the EFT is "initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit." *Id.* § 1693a(12); 12 C.F.R. § 1005.2(m). An unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through fraud or robbery. 12 C.F.R. § 205, Supp. I, section 2(m)(3).

109.   Under the EFTA and Reg. E, Wells Fargo, in response to a notice of an unauthorized EFT, must conduct a reasonable investigation, provisionally credit a consumer's account if Wells Fargo does not complete the investigation within 10 days, and refund all lost amounts in excess of (i) $50 if notice was provided within two business days of the consumer becoming aware of the unauthorized transfer or (ii) $500 if notice was provided within sixty days of the consumer becoming aware of the unauthorized transfer. 15 U.S.C. §§ 1693f, 1693g; 12 C.F.R. § 1005.6(b). With the exception of these liability thresholds based on the timing of notice provided, "a consumer incurs no liability from an unauthorized electronic fund transfer." 15 U.S.C. § 1693g(e).

110.   Wells Fargo offers consumers online and mobile banking and has connected these services to wire transfer networks. As a result, Wells Fargo provides consumers, through a "username and a password, and/or such other additional security and authentication methods as [WELLS FARGO] may require from time to time," the ability to electronically initiate wire transfers by sending Payment Orders directly to Wells Fargo, and the ability to fund those wire transfers by electronically authorizing Wells Fargo to debit their accounts.

111.   Scammers have illicitly infiltrated Plaintiff's and Class members' Wells Fargo online or mobile banking accounts to send unauthorized Payment Orders to Wells Fargo, which Wells Fargo accepted. The fraudulent Payment Orders

BLOOD HURST & O' REARDON, LLP

25

purportedly authorize Wells Fargo to debit Plaintiff's and Class members' bank accounts and pay itself for those Payment Order, which Wells Fargo has done. Wells Fargo did not execute these debits by Fedwire, CHIPS, or means of any other service that transfers funds held at either Federal Reserve banks or depository institutions. Plaintiff and the other Class members have not benefitted from these debits. Wells Fargo's electronic debits from Plaintiff's and Class member's accounts pursuant to wire transfer Payment Orders were EFTs.

112.   Plaintiff and the other Class members notified Wells Fargo within 60 days of discovery of the unauthorized debits for wire transfers.

113.   Wells Fargo's handling of unauthorized EFTs reported by Plaintiff and Class members within 60 days of discovery violates the EFTA and Reg. E because: (1) Wells Fargo fails to conduct a reasonable investigation to determine whether the EFT is unauthorized; (2) Wells Fargo failed to provisionally credit Plaintiff and Class members' accounts within ten days of their notices of unauthorized payment activity; and (3) Wells Fargo refuses to reimburse Plaintiff's and Class members' bank accounts with the amount of stolen funds in excess of $50 or $500 where consumers provided notice of unauthorized payment activity within two or sixty business days of discovery, respectively.

114.   Plaintiff and Class members have suffered actual and concrete harm as a result of Wells Fargo's violations of Reg. E. and the EFTA because they have been wrongfully deprived of their funds.

115.   Any person who fails to comply with any EFTA provision is liable under 15 U.S.C. § 1693m for the sum of: "(1) Any actual damage sustained by the consumer; (2) Statutory damages in an individual case of not less than $100 nor greater than $1000 or, in a class action, such amount as the court may determine with a maximum of the lesser of $500,000 or 1% of the Defendant's net worth; and (3) costs of the lawsuit together with reasonable attorneys' fees."

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

00224288

116. A financial institution is liable for treble damages under 15 U.S.C. § 1693f(e) if it does not provisionally re-credit a consumer's account within ten days after receiving the consumer's notice of an error and either 1) did not conduct a good faith investigation or 2) did not have a reasonable basis for believing the consumer's account was not in error.

117. Wells Fargo did not conduct a good faith investigation and did not have a reasonable basis for believing the account was not in error and authorized.

118. A financial institution is also liable for treble damages if it knowingly and willfully concluded that the consumer's account was not in error when it had no reasonable basis for that determination. 15 U.S.C. § 1693f(e)(2).

119. In pointing to the use of a username and password during the theft as a basis for concluding that the online requests were authorized, Wells Fargo knowingly and willfully concluded that the Payment Order were not in error when it had no reasonable basis for that determination.

120. As a result of Wells Fargo's violations of the EFTA and Reg. E., Plaintiff and Class members, seek actual damages pursuant to 15 U.S.C. § 1693m(a)(1); statutory damages in such amount as the court may determine with a maximum of the lesser of $500,000 or 1% of the Defendant's net worth; treble damages under 15 U.S.C. § 1693f; and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1693m(a)(3).

## SECOND CAUSE OF ACTION

### Violation of Uniform Commercial Code Article 4A

### (On behalf of Plaintiff and the Nationwide Class)

121. Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 102 as if fully set forth by this reference.

122. Under Article 4A of the UCC, Wells Fargo cannot refuse to refund payments for unauthorized Payment Orders unless Wells Fargo accepted the Payment Orders in good faith and in compliance with an agreed upon and commercially

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00224288

reasonable security procedure and any instructions of its customers restricting acceptance of payment orders. U.C.C. § 4A-202(b).

123.    Wells Fargo has the burden of establishing that it is more probable than not that it acted in good faith in compliance with the security procedures. U.C.C. §§ 4A-105(7); 4A-202(b); 1-201(b)(8).

124.    Under Article 4-A of the UCC, if Wells Fargo determines that its customers' funds were stolen in connection with unauthorized Payment Orders that were not enforceable, Wells Fargo "shall refund any payment . . . and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund." U.C.C. § 4A-204(1).

125.    Wells Fargo has failed to employ an agreed upon, commercially reasonable security procedure in connection with its handling of Payment Orders sent electronically online in the following respects:

- Wells Fargo's Online Access Agreement specifically states: "In this Agreement, `Service' refers to all WELLS FARGO Online, WELLS FARGO Business Online, WELLS FARGO Mobile, or WELLS FARGO Advisors online and mobile services, plus all Eligible Accounts and Online Financial Services you can access via the Website after entering into this Agreement, as described further below." However, access to the ability to initiate wire transfers online cannot be accessed via the Website after entering into the Online Access Agreement. Section 8.(a), governing "Digital Wire (formerly known as Online Wires)," states: "The following provisions supplement your applicable Wires Funding Eligible Account agreement;

- Section 8(b) of the Online Access Agreement, defining security procedure, states: "The Security Procedure consists of verifying your username and a password, and/or such other additional security and authentication methods as we may require from time to time."

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

126.  Wells Fargo's handling of unauthorized online wire transfer requests reported within 60 days of discovery by Plaintiff and Class Members, initiated using compromised consumer online or mobile banking access, violates the UCC in that it relies on its Online Access Agreement to claim that the use of a username and password to initiate the online wire transfer is sufficient for it to conclude the request was authorized.

127.  Wells Fargo has not acted in good faith or in compliance with its customers' instructions in connection with its handling of Payment Orders because Wells Fargo accepts Payment Orders in the face of anomalous activity that should have indicated suspicious or fraudulent activity, including Payment Orders that: (i) were received within hours of changes to consumers' electronic banking passwords; (ii) were received within hours of changes in consumers' online account type or status; (iii) were received within hours of consumer first entering the Wires Funding Eligible Account agreement; (iv) would have, if accepted and Wells Fargo executed EFTs from consumers' accounts in the same amounts, resulted in a near-zero balance in consumers' bank accounts; (v) were received following intra-bank transfers from consumers' other bank accounts that left near-zero balances in those other bank accounts; (vi) were the first or one of the first ever sent by consumers after several years of account activity; and (vii) were received within hours of similar Payment Orders that had been cancelled or were unable to be verified; and Wells Fargo accepts Payment Orders after consumers provide notice that those Payment Orders were unauthorized and the result of fraudulent activity.

128.  In addition, Wells Fargo's standard-form denial letters, which have appended no evidence, have described no findings, and have followed wholly inadequate investigations that often have not included basic interviews with affected consumer, do not satisfy Wells Fargo's burden to prove that it was more probable than not that it (i) acted in compliance with security procedures, (ii) acted in good faith, or (iii) adhered to consumers' instructions regarding Payment Orders.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

129.   Plaintiff and Class members did not authorize the online wire requests subsequently accepted by Wells Fargo.

130.   Plaintiff and Class members did notify Wells Fargo that the transfers were unauthorized well before the expiration of 90 days.

131.   Wells Fargo has refused to refund any portion of the unauthorized transactions involving Plaintiff's and Class members' accounts in violation of U.C.C. § 4A-204.

132.   Plaintiff and Class members seek a refund of the payment of the unauthorized Payment Orders, including any fees, along with interest on that amount pursuant to U.C.C. § 4A-204.

## THIRD CAUSE OF ACTION

**Violation of Business and Professions Code § 17200, *et seq.***

**(On behalf of Plaintiff and the Nationwide Class)**

133.   Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 through 102 as if fully set forth by this reference.

134.   Plaintiff and Wells Fargo are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

135.   The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

136.   In the course of conducting business, Wells Fargo committed unlawful business practices by, among other things, violating the EFTA and Regulation E, and the UCC Article 4A, as stated more fully above. Plaintiff reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

137.   In the course of conducting business, Wells Fargo engaged in unfair acts and practices by among other things, requiring consumers wishing to perform online banking to enter into its Online Access Agreement, which illegally attempts to alter their rights under the EFTA concerning unauthorized online wire transfers; by sending

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

letters to consumers claiming that unauthorized online wire transfers are actually authorized pursuant to its Online Access Agreement because of the use of the consumer's username and password; by failing to conduct good faith and reasonable investigations of the unauthorized Payment Orders; and by refusing to reverse unauthorized online wire transfer Payment Orders.

138.    The acts and practices complained of herein constitute unfair business practices because they are unlawful, fraudulent, immoral, unethical, oppressive, unscrupulous, unconscionable, substantially injurious to the general public, and offensive to public policy. While Plaintiff and Class members were harmed, Wells Fargo was unjustly enrichment by receiving payment of fees for the unauthorized wire transfers. As a result, Wells Fargo's conduct is unfair, as it offended an established public policy. Further, Wells Fargo engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

139.    As a direct and proximate result of Defendant's acts and unfair practices, Plaintiff, the Class were injured and lost money or property, including but not limited to, the harm suffered as a result of fraudulent transfers made from their accounts with Defendant. The lost money or property should be restored to the Plaintiff and the Class.

140.    As a direct and proximate result of Defendant's acts and practices described herein, Defendant has received and collected monies or property in the form of wire transfer fees to which Defendant is not entitled. These illicit profits should be disgorged.

141.    Defendant deals uniformly with a large volume of customers who dispute unauthorized charges. For example Defendant's misconduct as set forth above is part of a uniform policy and practice, as reflected in its Online Access Agreement and standardized, boilerplate form communications.  Each of Defendant's deceptive acts and practices set forth above therefore have a broad impact on consumers.

142.  The harm these practices caused to Plaintiff and the general public outweigh their utility, if any.

143.  Unless restrained and enjoined, Wells Fargo will continue to engage in the above-described wrongful conduct.  Plaintiff, on behalf of herself, Class members, and the general public, also seek restitution, disgorgement and an injunction, including public injunctive relief prohibiting Wells Fargo from contractually altering the rights afforded consumers as attempted in its Online Access Agreement and Deposit Account Agreement, and from relying on the username and password in denying the public relief, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

144.  The unlawful, unfair, and fraudulent business acts and practices of Defendant described herein present a continuing threat to the public in that Wells Fargo is currently engaging in such acts and practices and will persist and continue to do so unless and until an injunction is issued by this Court.

**FOURTH CAUSE OF ACTION**

**Violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq*.**

**(On behalf of Plaintiff individually)**

145.  Wells Fargo is a financial institution within the meaning of the Electronic Funds Transfer Act ("EFTA"). 12 C.F.R. § 1005.11.

146.  Plaintiff's accounts at Wells Fargo were and are demand deposit, savings deposit, or other asset accounts established primarily for personal, family, and household purposes.

147.  Wells Fargo holds or held Plaintiff's accounts and has issued a card with Radio-Frequency Identification (RFID) technology to be used for contactless payment and contactless use of ATMs with an explicit agreement to perform electronic funds transfers.

148.  An EFT under the EFTA is any transfer that "is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to

order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7); 12 C.F.R. § 1005.3(b)(1). "Automated teller machine transactions," such as an attempted ATM deposit is an EFT. *Id*. § 1693a(7).

149.   On June 26, 2024, after Plaintiff told Wells Fargo that the initiated wire transfer Payment Orders were unauthorized, Plaintiff received a call from someone purporting to be the Wells Fargo fraud department. The person told Plaintiff that the fraud involving the 3 transactions appeared to be internal at the Wells Fargo branch. They confirmed the two branches at which Plaintiff conducted her in person banking. They told Plaintiff that her help was needed in order to confirm the suspicion and instructed Plaintiff to withdraw $20,000 from her account in person, and then deposit it back into her account using the ATM, so that they could investigate the branch managers. Plaintiff was duped into following the instructions of the purported Wells Fargo fraud department and withdrew $20,000 from her Wells Fargo account. Plaintiff immediately attempted to deposit the money back into her account using an ATM at Wells Fargo. The deposit did not go into Plaintiff's account. It presumably went into an account controlled by the scammers.

150.   On June 27, 2024, after realizing the ATM fraud, Plaintiff went to a Wells Fargo branch to speak to someone in person and notified them about the ATM fraud. On July 6, 2024, Plaintiff personally delivered a written demand to Wells Fargo to return the money. She later faxed the letter to Wells Fargo on July 8, 2024. Although she was provided a separate claim number for the ATM deposit, Wells Fargo has never provided any indication that it has concluded there was no error or that it has even investigated the reported error in the transaction.

151.   Under the EFTA and Reg. E, Wells Fargo, in response to a notice of an error involving EFT, must conduct a reasonable investigation, provisionally credit a consumer's account if Wells Fargo does not complete the investigation within 10 days, and refund all lost amounts in excess of (i) $50 if notice was provided within two business days of the consumer becoming aware of the unauthorized transfer or

BLOOD HURST & O' REARDON, LLP

(ii) $500 if notice was provided within sixty days of the consumer becoming aware of the unauthorized transfer. 15 U.S.C. §§ 1693f, 1693g; 12 C.F.R. § 1005.6(b). With the exception of these liability thresholds based on the timing of notice provided, "a consumer incurs no liability from an unauthorized electronic fund transfer." 15 U.S.C. § 1693g(e). "An incorrect electronic fund transfer from or to the consumer's account" is an error the reporting of which requires investigation. 15 U.S.C. § 1693(f)(2).

152.    Scammers illicitly infiltrated Plaintiff's Wells Fargo online banking accounts and defrauded her into withdrawing money in person from the branch and depositing it back into her account using an ATM. The ATM deposit was an EFT under the EFTA.

153.    Plaintiff notified Wells Fargo within 2 business days of discovery of the missing ATM deposit EFT. Wells Fargo did not conduct a reasonable good faith investigation into the missing ATM deposit or refund Plaintiff her money.

154.    Plaintiff has suffered actual and concrete harm as a result of Wells Fargo's violations of Reg. E. and the EFTA because she has been wrongfully deprived of her funds.

155.    Any person who fails to comply with any EFTA provision is liable under 15 U.S.C. § 1693m for the sum of: "(1) Any actual damage sustained by the consumer; (2) Statutory damages in an individual case of not less than $100 nor greater than $1000 or, in a class action, such amount as the court may determine with a maximum of the lesser of $500,000 or 1% of the Defendant's net worth; and (3) costs of the lawsuit together with reasonable attorneys' fees."

156.    A financial institution is liable for treble damages under 15 U.S.C. § 1693f(e) if it does not provisionally re-credit a consumer's account within ten days after receiving the consumer's notice of an error and either 1) did not conduct a good faith investigation or 2) did not have a reasonable basis for believing the consumer's account was not in error.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00224288

157.   Wells Fargo did not conduct a good faith investigation and did not have a reasonable basis for believing the account was not in error and authorized.

158.   A financial institution is also liable for treble damages if it knowingly and willfully concluded that the consumer's account was not in error when it had no reasonable basis for that determination. 15 U.S.C. § 1693f(e)(2).

159.   Wells Fargo knowingly and willfully concluded that the ATM deposit was not in error when it had no reasonable basis for that determination.

160.   As a result of Wells Fargo's violations of the EFTA and Reg. E., Plaintiff seeks actual damages pursuant to 15 U.S.C. § 1693m(a)(1); statutory damages not less than $100 nor greater than $1000; treble damages under 15 U.S.C. § 1693f; and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1693m(a)(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for judgment against Defendants, jointly and severally, as follows:

1.   For an Order certifying this action as a Class action and appointing Plaintiff and her counsel to represent the Class

2.   For Violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.* related to the unauthorized Payment Orders, Plaintiff seeks, on behalf of herself and the Class, actual damages, attorneys fees, costs of suit, prejudgment interest, and treble damages;

3.   For Violation of Uniform Commercial Code Article 4A Plaintiff seeks, on behalf of herself and the Class, compensatory damages, attorneys fees, costs of suit, and prejudgment interest;

4.   For Violation of Business and Professions Code § 17200, *et seq.*, Plaintiff seeks on behalf of herself and the Class, restitution, disgorgement of profits, prejudgment interest and attorneys' fees;

BLOOD HURST & O' REARDON, LLP

5.    For Violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq*. related to the ATM deposit error, Plaintiff seeks, on behalf of herself, actual damages, attorneys fees, costs of suit, prejudgment interest, and treble damages;

6.    For violation of Business and Professions Code § 17200, Plaintiff also seeks public injunctive relief prohibiting Defendants from continuing their unlawful, fraudulent and unfair conduct, including, but not limited to, (a) requiring Defendants to alter the Online Access Agreement to keep consumer wire transfers from being excluded from the protection of the EFTA, (b) requiring Defendants to alter the Online Access Agreement to provide a security procedure beyond the username and password and eliminating the provision deeming any such procedure to be accepted as commercially reasonable by operation of contract, (c) requiring Defendants to refrain from denying repayment based on the use of a username and password; (d) requiring Defendants to refrain from sending its form letter telling consumers that the use of a username and password is sufficient to deny the request for repayment; (e) requiring Defendants to refrain from denying an unauthorized online wire transfer dispute without first conducting a reasonable inquiry into the allegedly unauthorized transaction and reasonably finding that the transaction of authorized, (f) requiring Defendants to refrain from denying any request to reverse allegedly unauthorized online wire transfer transactions without notifying the consumer' right to reproductions of all documents on which Defendants relied in reaching its decision.

7.    For reasonable attorneys' fees and costs of suit as permitted by law;

8.    For prejudgment interest as permitted by law;

9.    For such other and further relief as the Court may deem just and proper.

///
///
///
///
///

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

1

## JURY TRIAL DEMAND

2     Plaintiff hereby demands a trial by jury for all issues so triable.

3                                          Respectfully submitted,

4     Dated: March 28, 2025               BLOOD HURST & O'REARDON, LLP
                                          TIMOTHY G. BLOOD (149343)
5                                         PAULA R. BROWN (254142)

6
                                          By:        s/  Timothy G. Blood
7                                               TIMOTHY G. BLOOD

8                                         501 West Broadway, Suite 1490
                                          San Diego, CA  92101
9                                         Tel: 619/338-1100
                                          619/338-1101 (fax)
10                                        tblood@bholaw.com
                                          pbrown@bholaw.com
11
                                          SMN LAW GROUP APC
12                                        STEVEN M. NUÑEZ (185421)
                                          3517 Camino del Rio S., Suite 215
13                                        San Diego, CA  92108
                                          Tel: 619/296-8400
14                                        steve@smnlaw.com

15                                        *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

00224288